**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
--------------------------------------------------------------------X
                                                        :
SYNGENTA SEEDS, INC.                                    :
                                                        :
                         Plaintiff,                     :
                                                        :
            v.                                          :      1:09-cv-02370 ESH
                                                        :
BAYER BIOSCIENCE N.V.,                                  :
                                                        :
                                                        :
                         Defendant.                     :
                                                        :
--------------------------------------------------------------------X
```

**DEFENDANT'S MOTION, INCLUDING POINTS AND AUTHORITIES,
TO DISMISS THE DECLARATORY JUDGMENT COMPLAINT
<u>FOR LACK OF SUBJECT MATTER JURISDICTION</u>**

Robert J. Koch
  D.C. Bar 461907
MILBANK, TWEED, HADLEY
  & McCLOY LLP
1850 K Street, N.W., Suite 1200
Washington, D.C. 20006
Tel:  (202) 835-7500
Fax: (202) 835-7586
rkoch@milbank.com

*Counsel for Defendant
Bayer BioScience N.V.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      STATEMENT OF FACTS ................................................................................. 1

II.     ARGUMENT................................................................................................... 12

        A.      Standards For Declaratory Judgment Jurisdiction. ............................. 12

        B.      The Court Should Refuse to Exercise Declaratory Judgment Jurisdiction in
                this Case. ............................................................................................. 17

III.    CONCLUSION............................................................................................... 20

## TABLE OF AUTHORITIES

### CASES

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*,
   846 F.2d 731 (Fed. Cir. 1988)...................................................................... 12

*Bausch & Lomb Inc. v. Alcide Corp.*,
   684 F.Supp. 1155 (W.D.N.Y. 1987) .......................................................... 14

*Benitec Australia, Ltd. v. Nucleonics, Inc.*,
   495 F.3d 1340 (Fed. Cir. 2007)................................................................... 11

*Cedars-Sinai Medical Center v. Watkins*,
   11 F.3d 1573 (Fed. Cir. 1993)....................................................................... 2

*Davox Corp. v. Digital Systems International, Inc.*,
   846 F.Supp. 144 (D. Mass. 1993) .............................................................. 14

*EMC Corp. v. Norand Corp.*,
   89 F.3d 807 (Fed. Cir. 1996).................................................... 11, 13, 15, 16

*Hewlett-Packard Co. v. Acceleron LLC*,
   587 F.3d 1358 (Fed. Cir. 2009)................................................................... 12

*Hunt Mfg. Co. v. Fiskars Oy AB*,
   1997 WL 667117, *4 (E.D. Pa. 1997) ...................................................... 14

*IVX Animal Health, Inc. v. Burger*,
   475 F. Supp. 2d 1264 (S.D. Fla. 2007) ................................................ 14, 16

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007)............................................................................... 10, 11

*NSI Corp. v. Showco, Inc.*,
   843 F.Supp. 642 (D. Or. 1994) .................................................................. 14

*Phillips Plastics Corp. v. Kato Hatsujou K.K.*,
   57 F.3d 1051 (Fed. Cir. 1995)..................................................................... 14

*SanDisk Corp. v. STM Microelectronics, Inc.*,
   480 F.3d 1372 (Fed. Cir. 2007)............................................................. 11, 12

*Servco Servs. Co, L.P. v. Kelley Co., Inc.*,
   51 F.3d 1037 (Fed. Cir. 1995)..................................................................... 11

*Sony Electronics, Inc. v. Guardian Media Tech., Ltd.*,
   497 F.3d 1271 (Fed. Cir. 2007)...................................................... 11, 12, 16, 17

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995) .................................................................................... 11

### STATUTES

28 U.S.C. §2201 ................................................................................................. 1

### RULES

Fed. R. Evid. 408 .............................................................................................. 17

## MOTION TO DISMISS COMPLAINT

Defendant Bayer BioScience N.V. ("Bayer") moves to dismiss the complaint for declaratory judgment filed December 15, 2009 by Plaintiff Syngenta Seeds, Inc. ("Syngenta") because no immediate, justiciable controversy exists between the parties as required under the Declaratory Judgment Act, 28 U.S.C. §2201 *et seq.* This motion is supported by the Declaration of Phillippe Dumont, concurrently filed with a motion to seal same, and the statement of specific points of law and authority supporting the motion in compliance with Local Rule 7(a), which appears below.

## POINTS OF LAW AND AUTHORITY IN SUPPORT OF MOTION TO DISMISS

### I.      STATEMENT OF FACTS

1.      The Complaint in this action was filed on December 15, 2009, and seeks a declaration that Bayer's U.S. Patents Nos. 5,866,784; 5,908,970; and 6,172,281 ("the patents-in-suit") are invalid and not infringed by activities proposed by Syngenta.  Complaint, ¶13, *et seq.*

2.      Syngenta did not serve a Summons or a copy of the Complaint upon Bayer when it was filed or thereafter.  In fact, Bayer has waived service and its counsel has appeared for the purpose of filing this motion to dismiss.[1]

3.      These patents relate to technology that the parties have referred to as "Dual Bt" in that the patents relate to the insertion into plants of genetic material that causes the plant to create more than one protein derived from the bacterium *Bacillus thuringiensis* ("Bt"), which proteins have insecticidal properties.  Dumont Decl. ¶7.

---

[1] By order of December 29, 2009 (Docket Item #6), the Court permitted Syngenta to effect service of the complaint by publication.  Bayer understands that Syngenta has initiated, but not completed, the requirements of service by publication under the Court's order.

4.     The Complaint further alleges that Syngenta has sought a license to the patents-in-suit in negotiations spanning over two years, but that the negotiations are now at an impasse. Complaint, ¶5.  This is incorrect, as shown below.

5.     The Complaint further alleges that Bayer has notified Syngenta that Syngenta's planned activities relating to the development and planned sale of corn containing combinations of Bt-derived insect resistance traits require a license to the patents-in-suit.  Complaint, ¶33. Although this allegation is partly true, it ignores the context in which the communication was made, which is critical to the determination of this instant motion, as shown below.[2]

6.     Taken in context, the communications between the parties do not demonstrate the existence of an immediate controversy that requires the Court's intervention.  To the contrary, the filing of this lawsuit by Syngenta is clearly a tactic designed as an attempt to increase leverage during a critical time in the parties' lengthy negotiations that cover a broad array of technological areas in which the parties are discussing various collaborative and licensing options.  This can be understood by referring to the history of the negotiations.  Even more to the point, with respect to the patents at issue in this case, the parties are continuing to exchange term sheets and e-mails with each other and at this stage, the financial terms have been agreed.  The only genuine outstanding question is whether one specific insect control product will be included within the scope of the license. Dumont Decl., ¶3.

---

[2] Where a motion to dismiss for lack of subject matter jurisdiction "denies or controverts the pleader's allegations of jurisdiction.... only uncontroverted factual allegations are accepted as true for purposes of the motion."  *Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).  "All other facts underlying the controverted jurisdictional allegations are in dispute and are subject to fact-finding by the district court." *Id.*, 11 F.3d at 1584.

7.      The parties' negotiations began after representatives of Syngenta contacted representatives of Bayer in June and July 2007, after the appointment of a new CEO of Syngenta. The persons involved in the original communications the Head of Business Development for Syngenta, and a Product Manager for Bayer.  The parties agreed to meet and begin discussions to identify various areas of technology on which each side believed it may have a mutual interest in collaborating with the other.  Dumont Decl., ¶4.

8.      The parties then embarked on negotiations over specific terms involving license rights to multiple technologies which have spanned the last two years, and continue to this day. The negotiations over these terms have been simultaneous and related in the sense that both parties wish to license technologies from each other and both parties have understood that concessions made on terms in one area are likely to draw benefits on terms in another area.  In other words, the parties have been negotiating a complex "package deal" with many parts and have understood that a negotiating advantage gained in one area will impact the outcome of the negotiations in other areas.  Many of the areas of technology under discussion involve the genetic alteration of plants to achieve a commercially advantageous results, such as improved resistance to insects or improved tolerance to herbicides that are used to manage weeds that interfere with the growth of the genetically altered plant.  To that end, the parties entered into a Secrecy Agreement to protect the confidentiality of their negotiations on July 11, 2007.  Dumont Decl., ¶5.

9.      The first significant meeting between the parties took place on July 26, 2007.  The discussion covered a long list of technologies that Syngenta wanted to license from Bayer and one that Bayer wanted to license from Syngenta.  Dumont Decl., ¶6.

10.     In September 2007, Bayer sent to Syngenta complete drafts of five license agreements covering five areas of technology that Bayer was willing to license to Syngenta.  In October 2007, Syngenta presented Bayer with a term sheet under which it was willing to offer a license to a particular Syngenta technology.  Dumont Decl., ¶7.

11.     The parties' discussions continued in November and December 2007, through email correspondence and in at least one meeting in December.  During these communications, the parties discussed not only the specifics of Sygenta's term sheet, but also possible royalty terms for a Syngenta license to certain of Bayer's technologies.  In addition, the parties discussed Syngenta's interest in obtaining a license under Bayer's Dual Bt patents, including the patents-in-suit.  Dumont Decl., ¶8.

12.     On March 3, 2008, Syngenta sent to Bayer a detailed term sheet including royalty provisions that included licensing terms for seven different technologies.  Dumont Decl., ¶9.

13.     On April 4, 2008, Bayer sent Syngenta a detailed redlined markup of Syngenta's term sheet reflecting Bayer's positions on the specific proposals that Syngenta had made on this mutual exchange of rights to multiple technologies.  On April 16, 2008, Syngenta provided its counter-proposals to Bayer's counter-proposals in the form of a further detailed redlined markup of the term sheet, including comments on Bayer's proposals, concessions and indications of terms on which Syngenta was unwilling to compromise.  Dumont Decl., ¶10.

14.     The parties then scheduled a face-to-face meeting, which occurred on May 15, 2008 in Chicago.  The parties created formal minutes documenting the discussions at the meeting.  These minutes reflect that the parties continued to discuss the specific terms on which they might reach agreement for a license to patents covering seven different technologies, many

of which overlapped those included in the exchange of term sheets, as well as a contract involving a particular herbicide.  Dumont Decl., ¶11.

15.     The minutes reflect what was consistently the case before and after the Chicago meeting—the parties' discussions over a license to Bayer's Dual Bt patents were simply one component of a complex, multi-faceted deal with many moving parts.   The minutes do specifically reflect, however, that Bayer was (and still remains) willing to license its Dual Bt technology to Syngenta as part of the multi-faceted deal on specified royalty terms and for different crops.  The minutes conclude by reflecting the parties' understanding that they would undertake further negotiations on the topics, including exchanging further term sheets.  Dumont Decl., ¶12.

16.     Syngenta provided Bayer with a new proposal in August 2008, which was stated to contain "concept ideas" in an attempt to "simplify" the discussions.  The proposal addressed licensing of Syngenta's technology as well as certain of Bayer's genetic trait technologies.  The parties discussed this proposal during a September 4, 2008 meeting in Dusseldorf, Germany.  Although Bayer was not receptive to Syngenta's "simplified" proposal, the parties understood that the negotiations were neither over nor at an impasse following the Dusseldorf meeting.  Dumont Decl., ¶13.

17.     In fact, the parties continued their discussions and in the Spring of 2009, the parties reached a verbal agreement on key commercial terms for a license to Syngenta under certain of Bayer's herbicide tolerance technology for soybeans.  These terms are summarized in a May 17, 2009 exchange of emails between representatives of the parties, although no formal, written agreement which incorporates these terms has yet been signed.  However, later

correspondence indicates that Syngenta remains interested in entering into a formal agreement based on the terms agreed in May.  Dumont Decl., ¶¶14-15.

18.     On May 28, 2009, Bayer sent to Syngenta another term sheet addressing multiple areas of interest to the parties.  The parties then had another face-to-face meeting on June 26, 2009 and subsequently held a teleconference on July 6, 2009.  The parties discussions continued to focus on eight different areas of cooperation, only one of which related to whether Syngenta would take a license under Bayer's Dual Bt patents-in-suit.  Dumont Decl., ¶16.

19.     Following the July 6, 2009 teleconference, Bayer sent an email to Syngenta on July 23, 2009 summarizing the status of the parties' discussions to that point.  It is this email that is referenced in Paragraph 33 of the complaint, in which Syngenta alleges that "Bayer, through its representative Philippe Dumont, notified Syngenta on at least July 23, 2009 that Syngenta's development and planned sale of corn containing combinations of Bt-derived insect resistance traits required a license to the Bayer Patents."  Dumont Decl., ¶17.

20.     The Complaint mischaracterizes the statement in Mr. Dumont's July 23, 2009 email because Syngenta has never told Dumont, nor anyone else at Bayer, what combination insect control products Syngenta plans to sell or when it may sell them.  Nowhere did Dumont state that Syngenta's "development and planned sale of corn … required a license" as alleged in the Complaint.  Dumont Decl., ¶17.

21.     Moreover, the specific statement referenced by Syngenta is contained in a multi-page email summary of the parties' discussions on the multiple topics described above and was intended simply to address the position that Syngenta had expressed in the parties' recent discussions that Syngenta believed it already had rights to commercialize their proposed Bt corn

product by virtue of a previous agreement negotiated in the 1999-2000 time frame between the predecessors of the two parties to this litigation.  It is Bayer's position that the Dual Bt technology (and thus a license to the patents-in-suit) was not included in that earlier agreement. Taken in context, Bayer's statement was simply one example of the many statements in the parties' various communications in which they informed one another of their respective negotiating positions relating to each of the many areas under discussion.  There is no reason for Syngenta to have singled out this statement other than as support for their strategic filing of this lawsuit to attempt to obtain some form of leverage in the ongoing negotiations.  Dumont Decl., ¶18.

22.     In fact, on July 31, 2009, Syngenta replied to Bayer's July 23, 2009 email summary of the status of the negotiations by adding comments to several of the remarks on the eight topics under discussion.  Syngenta made no comments about Bayer's remarks summarizing the discussions on the Dual Bt topic.  Dumont Decl., ¶19.

23.     Following this exchange of email correspondence, the parties continued their communications regarding the several licensing topics under discussion.  Syngenta returned a redlined version of a term sheet to Bayer on September 18, 2009 addressing topics specific to technologies used with cotton crops.  This term sheet addressed the terms under which Syngenta would be willing to license a certain cotton insecticide technology and the parties had further detailed email exchanges on this topic in October, November and December 2009, including after this lawsuit was filed.  Dumont Decl., ¶20.

24.     The parties met yet again on November 6-7, 2009 to discuss many of the outstanding items on which the parties had been negotiating, including not only Dual Bt

technology, but also several other Bayer technologies.   During a face-to-face discussion on November 6 in connection with our discussions on all of these topics, Syngenta's representatives indicated that Syngenta would be making a "standalone" proposal as to the terms under which Syngenta would license Bayer's Dual Bt patents.  One of Syngenta's representatives also stated that Syngenta had been remiss in not sending Bayer a mark up of Bayer's May 28, 2009 term sheet.  Dumont Decl., ¶21.

25.     On November 10, 2009, Syngenta sent to Bayer a term sheet, labeled "Without Prejudice Settlement Negotiations under FRE 408" which contained Syngenta's proposal for a license under Bayer's Dual Bt technology.  None of the parties' previous communications had been labeled in this fashion and Syngenta had not suggested to that point that the parties had a dispute or that they intended to file a lawsuit.  Dumont Decl., ¶22.

26.     On November 19, 2009,  Bayer sent back a redlined revision of Syngenta's September 18, 2009 term sheet relating to technologies specific for cotton.  Dumont Decl., ¶23.

27.     On November 27, 2009, Bayer sent an email to Syngenta expressing Bayer's desire to follow up on the discussions the previous summer relating to the multiple items that had been the subject of Bayer's May 28, 2009 term sheet and the parties' June 26, 2009 meeting and reiterated Bayer's desire to tackle the various topics as a "complete package" even though it was understood that some topics might be dropped if one party was no longer interested in pursuing a license.  Bayer noted that the only topic on which it had received formal, specific feedback from Syngenta was Dual Bt, and that Bayer owed Syngenta a response.  Bayer also stated that it intended to schedule a meeting with Syngenta to further discuss these topics and asked that a

new topic be added to the discussions on an expedited basis relating to certain Syngenta technology relating to genetic traits for corn.  Dumont Decl., ¶24.

28.     On November 30, Syngenta sent two emails to Bayer seeking clarification of Bayer's request relating to the new area of technology.  Syngenta also sent a third email responding to Bayer's term sheet regarding cotton technologies.  None of these emails mentioned Dual Bt or that the parties had any dispute.  Dumont Decl., ¶25.

29.     On December 9, 2009, as previously promised in its email, Bayer sent to Syngenta a revised term sheet addressing eight different areas of technology, one of which was Dual Bt.  The others included terms under which the parties might acquire a license from each other under patents covering many of the same technologies that had been under discussion previously, as well as new technologies not previously formally incorporated into term sheets. Dumont Decl., ¶26.

30.     The parties met face-to-face the next day, on December 10, 2009, to discuss the specifics of Bayer's latest proposals.  During that discussion, a Syngenta representative told Bayer representatives that some of the items being discussed could be resolved quickly if they were uncoupled from each other.  With specific reference to a Syngenta technology in cotton, the Syngenta representative indicated that this offered license was "no longer on the table."  Other than disagreeing with certain royalty terms on certain items, the Syngenta representative never indicated that Syngenta had a dispute with Bayer and promised to revert back to Bayer very shortly, with specific reference to those technology licenses which Syngenta was interested in carrying forward quickly. Bayer was specifically told that the items Syngenta wished to carry

forward included at least three areas of technology, one of which was Dual Bt.  No mention was made of any litigation or need for dispute resolution.  Dumont Decl., ¶27.

31.     On December 11, 2009, Syngenta's CEO sent an e-mail to Bayer's CEO indicating that Syngenta's various collaborative discussions with Bayer across a range of items "have principally now been halted."  However, the email indicated that Syngenta believed that "there is still plenty of scope for collaboration between our firms and I often exhort my own team to avoid the temptation to think about the industry with a zero-sum mindset."  This e-mail caused consternation within Bayer, because Syngenta's representative had not indicated on December 10 that all discussions were stopped, only that the one cotton technology being offered by Syngenta for licensing to Bayer was no longer on the table. No mention was made in Syngenta's CEO's e-mail that Syngenta was intending to file a lawsuit.  However, as it turned out, the parties' negotiations had not stopped.  Dumont Decl., ¶28.

32.     On December 15, 2009, without any prior warning, Syngenta filed, but did not serve, the complaint in this action seeking a declaratory judgment that Bayer's Dual Bt patents are invalid.  Dumont Decl., ¶29.

33.     In the following days a person in Bayer's Intellectual Property team spoke with a Syngenta Patent Counsel and reported the conversation to his management in an email dated December 17, 2009.   This contemporaneous email reflects Syngenta's Patent Counsel's statements that Syngenta had "just filed the complaint and have delayed service to see whether they can see progress from our side" and that "[Syngenta] are prepared to continue and see what happens down the road but they would clearly prefer a negotiated solution . . . ."  In other words,

it is clear from Syngenta's Patent Counsel's remarks that the filing of the lawsuit was purely tactical.  Dumont Decl., ¶30.

34.     Consistent with Syngenta's Patent Counsel's remarks, nearly one week after the complaint was filed, on December 21, 2009, A Syngenta representative wrote an email to Philippe Dumont of Bayer marked "Syngenta Confidential provided without Prejudice under FRCP [sic] 408."  In it, the Syngenta representative stated that, as a follow up to the December 10 meeting, Syngenta was identifying three topics on which it was willing to proceed to attempt to negotiate license that would "stand by themselves and not be linked to other licenses or negotiations between the parties."  The Syngenta representative also stated Syngenta's desire to "bring these to a conclusion quickly in the first quarter of 2010."  The three topics identified by Syngenta included the Bayer Dual Bt technology as well as two other technologies.  With regard to Dual Bt, Syngenta stated the royalty terms under which it would be willing to accept a license. Dumont Decl., ¶31.

35.     Thus, despite having filed its declaratory judgment action, Syngenta remained willing to negotiate the terms of a license to Bayer's Dual Bt patents.   The statement in Paragraph 5 of the complaint that license negotiations "are now at an impasse" is directly contradicted by both parties' correspondence immediately before and after the filing of the complaint that indicate that both remain willing to discuss the terms of a license to Dual Bt as well as other technologies.  Dumont Decl., ¶32.

36.     In fact, the parties met yet again, for three hours, on January 22, 2010 to continue their discussions on the various outstanding licensing issues between the parties.  The parties discussed five of the technological areas that they had previously been discussing, including

Dual Bt.  With regard to Dual Bt, the parties remain largely agreed on the economic terms contained in Bayer's May 29, 2009 term sheet, and are separated only by the issue of whether one particular insect control product will be included as a licensed product.  Dumont Decl., ¶33.

37.     The filing of the lawsuit, which Syngenta appears to have been contemplating as early as November 10, 2009 when Syngenta sent its term sheet marked under FRE 408, is a transparent strategic attempt to gain a more favorable bargaining positions in the parties' ongoing negotiations by threatening Bayer with a potentially costly litigation over the validity of the Dual Bt patents, in what Syngenta must view as its effort to further its stated purpose of bringing the negotiations to an end "quickly" on at least the three technologies discussed in its December 21, 2009 email.  This tactic is a departure from the parties' previous approach, which had been to discuss licensing of all of the various technologies under discussion as a "package deal."  Dumont Decl., ¶34.


## II.     ARGUMENT

### A.     Standards For Declaratory Judgment Jurisdiction.

A court has subject matter jurisdiction under the Declaratory Judgment Act only if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).  In patent cases, declaratory judgment jurisdiction exists "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has a right to engage in the accused activity without license." *SanDisk Corp. v. STM Microelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007).

The burden is on the declaratory judgment plaintiff—in this case Syngenta—to demonstrate the existence of declaratory judgment jurisdiction. *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007). Moreover, even if the plaintiff succeeds in demonstrating that there exists an "actual controversy" within the meaning of the statute, the court retains "unique and substantial" discretion to decline to exercise jurisdiction over the suit where doing so would be inconsistent with the exercise of federal judicial power. *MedImmune*, 549 U.S. at 136; *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 813 (Fed. Cir. 1996) (both quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)). Thus, a court may dismiss a declaratory judgment action, even if an actual controversy exists, "based on a 'reasoned judgment whether the investment of time and resources will be worthwhile.'" *EMC Corp.*, 89 F.3d at 814 (quoting *Servco Servs. Co, L.P. v. Kelley Co., Inc.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995)).

Cases in which a controversy has been found to be sufficiently real and immediate and that warrant judicial relief normally involve factual scenarios in which license negotiations between the declaratory judgment plaintiff and the patent holder have failed or are non-existent, and the patent holder has made clear its intention to enforce its patent rights against specified accused infringing products. Thus, for example, in *Sony Electronics, Inc. v. Guardian Media Tech., Ltd.*, 497 F.3d 1271 (Fed. Cir. 2007), the patent holder had notified a number of electronics companies, including Sony, Mitsubishi, Matsushita and JVC, that certain of those companies' products were infringing specified patents. The patent holder engaged in protracted negotiations to license its patents to each company. However, when it became clear that these negotiations had reached an impasse, each company filed a declaratory judgment action challenging the validity and infringement claims of the patentee. The district court rejected the

13

patent owner's motion to dismiss the actions and the Court of Appeals affirmed.  *Id.*, 497 F.3d at 1274-1281.

Another example is found in *SanDisk*, 480 F.3d at 1374-1377, where during a series of correspondence and meetings the patent holder had presented through seasoned litigation experts a thorough and detailed analysis showing the alleged infringement of 14 of its patents by specified products of the declaratory judgment plaintiff.  The declaratory judgment plaintiff disagreed with the patentee's analysis and declined to participate in further license negotiations, effectively terminating them.  The plaintiff was thus permitted to seek a judicial declaration of its rights.  *See id.*, 480 F.3d at 1382 & n.3.

Of similar import is *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358 (Fed. Cir. 2009), where the patent holder, whose entire business was based on generating revenue from licensing and enforcing patents, wrote a letter to the declaratory judgment plaintiff identifying a patent as pertaining to a specific product line of the plaintiff.  A second letter by the patentee set a short deadline for response and stated that the lack of response would indicate that the plaintiff "was not interested in discussing this patent."  *Id.*, 587 F.3d at 1361.  The plaintiff refused to respond and instead filed a declaratory judgment action.  The Federal Circuit, in affirming the declaratory judgment jurisdiction of the district court, likened the situation to "scare the customer and run" tactics in which the patent owner was using its patent to disrupt the commercial market while attempting to avoid exposing the patent to legal challenge.  *See id.*, 587 F.3d at 1362 (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 734-35 (Fed. Cir. 1988)).  The court distinguished the facts in *Hewlett-Packard* from the case in which a party receives "a meet-and-discuss inquiry by a competitor, presumably with intellectual property of its own to place on the bargaining table."  *Id.*, 587 F.3d at 1363.  In the latter instance—which

aligns more closely to the facts in this case—competitors are more likely to be seeking a business rather than a judicial resolution.

Indeed, in cases where no affirmative threats of litigation have been made and license negotiations are still in progress, courts have rejected attempts by declaratory judgment plaintiffs to gain leverage in the negotiations by filing suits seeking to invalidate patents involved in the licensing discussions.  In such cases, there is no controversy of sufficient immediacy and reality to warrant intervention by the court.  To the contrary, a court should avoid being drawn into the parties' extra-judicial efforts to arrive at a mutually beneficial business arrangement by issuing a declaration of rights that may benefit one party over the other, or even entertaining an expensive litigation process which of itself might impact the final outcome of the negotiations.  In such cases, the investment of judicial time and resources to adjudicate the declaratory judgment action is not "worthwhile."  *EMC Corp.*, 89 F.3d at 814.

Thus, in *EMC Corp.*, the U.S. Court of Appeals for the Federal Circuit affirmed a district court's dismissal of a declaratory judgment action that was filed in the midst of the parties' licensing negotiations.  *Id.*, 89 F.3d at 809.  The Federal Circuit endorsed the district court's reasoning that allowing a declaratory judgment action to proceed under such circumstances "would create an incentive structure that is inconsistent with the public interest in preserving declaratory proceedings for cases closer to the central objectives of declaratory proceedings" *Id.*, 89 F.3d at 814.  Specifically, the Federal Circuit approved of the district court's reasoning "that a party in EMC's position could abuse the declaratory judgment device to obtain a more favorable bargaining position in its ongoing negotiations with the patentee and also to undermine the value of the patent so as to impede its sale or licensing to a third party."  *Id.*  The Federal Circuit thus held that, in deciding whether to exercise its discretion to hear a declaratory judgment action in a

patent case, the district court should consider whether the parties were still engaged in licensing negotiations at the time the suit was filed and that, in such circumstances, "the need for judicial relief is not as compelling as in cases in which there is no real prospect of non-judicial resolution of the dispute." *Id.* As the court summed it up in *Phillips Plastics Corp. v. Kato Hatsujou K.K.*, 57 F.3d 1051, 1053 (Fed. Cir. 1995): "When there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotiations have broken down." Such is the case here—negotiations between Syngenta and Bayer remain ongoing.

Other examples demonstrating this precedent include *IVX Animal Health, Inc. v. Burger*, 475 F. Supp. 2d 1264 (S.D. Fla. 2007), where the district court declined to exercise declaratory judgment jurisdiction because the complaint was filed in the midst of licensing negotiations, which continued after the filing of the suit, and the declaratory plaintiff in reality was seeking "a commercial, not a judicial remedy." *Id.*, 475 F. Supp. 2d at 1269. *See also Davox Corp. v. Digital Systems International, Inc.*, 846 F.Supp. 144,148 (D. Mass. 1993) (declining to exercise declaratory judgment jurisdiction where declaratory plaintiff's communications had indicated that plaintiff would respond to defendant's letters bringing its patent to the plaintiff's attention and thus negotiations were ongoing); *NSI Corp. v. Showco, Inc.*, 843 F.Supp. 642, 645-46 (D. Or. 1994) (dismissing declaratory judgment action where plaintiff had led defendant into believing that negotiations were ongoing in order to gain advantage in choice of forum); *Bausch & Lomb Inc. v. Alcide Corp.*, 684 F.Supp. 1155, 1160 (W.D.N.Y. 1987) (dismissing declaratory judgment action where avenues for a negotiated resolution of the dispute were still open to the parties); *Hunt Mfg. Co. v. Fiskars Oy AB*, 1997 WL 667117, *4 (E.D. Pa. 1997) (dismissing declaratory judgment action filed to secure forum shopping advantage while correspondence between the parties was still ongoing).

**B.    The Court Should Refuse to Exercise Declaratory Judgment Jurisdiction in this Case.**

The Court should dismiss Syngenta's declaratory judgment complaint because the parties remain in active, ongoing negotiations over patent license rights covering a number of technologies relating to genetically modified plants in different crops.  The negotiations have continued for over two months *after* the complaint was filed (but not served) in this action and the parties appear to be relatively close to an agreement:  they are separated only over the issue of whether one particular insect control product would be included within a license from Bayer to Sygnenta under the patents-in-suit.  Dumont Decl. ¶¶31-33.  The fact that these complex and multi-faceted negotiations have been ongoing since 2007 and Syngenta may now wish that they be brought to an end quickly is not a sufficient reason for the Court to expend scarce judicial resources adjudicating a dispute that is not ripe.  Moreover, the Court should not allow itself to be used by Syngenta in a transparent strategic ploy to gain an upper hand in the negotiations by threatening Bayer with expensive patent litigation. Exercise of this court's declaratory judgment jurisdiction would therefore not be worthwhile.

This case falls within the class of precedent in which courts have declined to exercise declaratory judgment jurisdiction because to do so "would create an incentive structure that is inconsistent with the public interest in preserving declaratory proceedings for cases closer to the central objectives of declaratory proceedings" *EMC Corp.*, 89 F.3d at 814.  And in particular, "a party in [Syngenta's] position could abuse the declaratory judgment device to obtain a more favorable bargaining position in its ongoing negotiations with [Bayer] and also to undermine the value of the patent so as to impede its sale or licensing to a third party." *Id.*

Just as in *EMC Corp.* (and similar cases such as *IVX Animal Health*, discussed *supra*), the negotiations between the parties have not failed.  Rather, negotiations have been ongoing for more than two months since the declaratory judgment complaint was filed.  This is shown by the fact that:

- Syngenta filed the Complaint without warning on December 15, 2009, only six days after receiving a revised term sheet from Bayer addressing eight areas of technology including Dual Bt.  Dumont Decl. ¶¶26-29;

- Syngenta did not serve the Complaint immediately after it was filed, but rather attempted to reserve its place in the courthouse while it continued negotiations. In fact, one Syngenta representative admitted that Syngenta had filed the suit and withheld service to see whether Bayer would show "progress" as a result, but that Syngenta preferred a "negotiated solution."  Dumont Decl. ¶30;

- Syngenta, on December 21, 2009—six days after the declaratory judgment complaint was filed—sent to Bayer an email containing the terms under which Syngenta would license Bayer's Dual Bt patents, as well as two other Bayer technologies.  Dumont Decl., ¶31.

- The parties met face-to-face for three hours on January 22, 2010, more than one month after the filing of the complaint, which has still not been served, to continue their discussions on the various outstanding licensing issues between the parties.  The parties discussed five of the technological areas that they had previously been discussing, including Dual Bt.  With regard to Dual Bt, the parties remain largely agreed on the economic terms contained in Bayer's May

29, 2009 term sheet, and are separated only by the issue of whether one particular

insect control product will be included as a licensed product.  Dumont Decl., ¶33.

This set of facts is wholly analogous to those in *EMC Corp.*, where the declaratory judgment complaint was filed three days after the declaratory judgment plaintiff had stated it would schedule what would have been a fourth meeting in the ongoing negotiations; the plaintiff admitted that the suit was filed to "protect" itself while continuing discussions; and the parties held two additional negotiation meetings *after* the complaint was filed.  *Id.*, 89 F.3d at 809.  In those circumstances, the Federal Circuit affirmed the district court's decision to decline to entertain the declaratory judgment suit.  *See also IVX Animal Health*, 475 F. Supp. 2d at 1268-1269 (dismissing declaratory judgment action where negotiations toward settlement continued after the complaint was filed and plaintiff requested extension of time in which to serve complaint "due to initial discussions relating to a possible resolution of the case").

In contrast, this case is unlike those in which courts have exercised declaratory judgment jurisdiction.  As discussed, *supra*, the courts in those cases determined that negotiations truly had failed and no extra-judicial avenues remained for resolution of the parties' dispute.   This is perhaps best illustrated in *Sony Electronics*, where prior to the filing of the declaratory judgment action, the plaintiffs had either explicitly rejected the patentee's last outstanding offer (in the case of Matsushita, JVC and Mitsubishi), *id.*, 497 F.3d at 1279, 1281 or by silence clearly indicated a rejection based on the context of the parties' communications (in the case of Sony).  *Id*., 497 F.3d at 1275-1276.  The Federal Circuit noted that, on the record that existed in *Sony Electronics*, no evidence existed that the declaratory judgment action was filed for the purpose of gaining an unfair advantage over the patentee in negotiations, and thus distinguished *EMC Corp.* on that basis.  *Id.*, 497 F.3d at 1289.

This record does indicate that Syngenta's filing of the declaratory judgment complaint was, in fact, a strategic maneuver designed to increase its leverage in the parties' negotiations. Syngenta appears to have been contemplating such a maneuver at least as early as November 10, 2009 when it sent Bayer a term sheet for licensing of the Dual Bt patents marked under Fed. R. Evid. 408 (a notation that had not been used on the parties' communications previously). Dumont Decl., ¶¶22, 34.   The Court should not allow itself to be manipulated by one party seeking a negotiating advantage over the other.

The parties' negotiations had been understood as involving a "package deal" where concessions made on terms in one area are likely to draw benefits on terms in another area. Dumont Decl., ¶5.   Syngenta appears to have made the calculation that applying pressure on Bayer by threatening expensive litigation over the Dual Bt patents was likely to create benefits not only in affecting the terms of any resulting license to the Dual Bt patents themselves, but perhaps in licensing other areas of technology as well.

The fact remains, however, that Syngenta seeks a negotiated, commercial solution of the terms under which it may use the Dual Bt technology, not a judicial resolution of the validity of Bayer's patents.   This is evident from the fact that Syngenta has continued to negotiate with Bayer more than two months after filing, but not serving, the lawsuit.

## III.    CONCLUSION

For the foregoing reasons, Bayer respectfully requests that the Court decline to exercise declaratory judgment jurisdiction in this case, and dismiss the Complaint in this action.

Dated:  February 25, 2010

Respectfully submitted,

_____/s/ Robert J. Koch_____
Robert J. Koch
  D.C. Bar 461907
MILBANK, TWEED, HADLEY
  & McCLOY LLP
1850 K Street, N.W., Suite 1200
Washington, D.C. 20006
Tel:  (202) 835-7500
Fax: (202) 835-7586
rkoch@milbank.com
*Counsel for Defendant*
*Bayer BioScience N.V.*

## CERTIFICATE OF SERVICE

I certify that the foregoing DEFENDANT'S MOTION, INCLUDING POINTS AND

AUTHORITIES, TO DISMISS THE DECLARATORY JUDGMENT COMPLAINT

FOR LACK OF SUBJECT MATTER JURISDICTION was served via electronic mail and hand

delivery on this 25th day of February, 2010 upon the following counsel for Syngenta Seeds, Inc.

in the manner indicated:

**VIA ELECTRONIC MAIL AND HAND DELIVERY**

John M. Faust
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C. 20004-1008
Tel:  (202) 639-6500
Fax:  (202) 639-6604
jfaust@velaw.com

**VIA ELECTRONIC MAIL**

Constance Huttner
VINSON & ELKINS L.L.P.
666 Fifth Avenue, 26th Floor
New York, NY 10103
Tel:  (212) 237-0000
Fax:  (212) 237-0100
chuttner@velaw.com

Stephen C. Stout
VINSON & ELKINS L.L.P.
2801 Via Fortuna, Suite 100
Austin, Texas 78746
Tel:  (512) 542-8400
Fax:  (512) 542-8612
sstout@velaw.com

_____/s/ Robert J. Koch_____

22